In the Matter of Darwin BARR and Margaret Barr d/b/a Barr Oil Co., Debtors.

Bankruptcy No. 83–01156–BE.

United States Bankruptcy Court, E.D. Michigan, S.D.

April 18, 1984.

I. William Cohen, Steven P. Schubiner, Detroit, Mich., for Atlantic Richfield Oil Co.

Donald B. Lifton, Phillip J. Shefferly, Southfield, Mich., for debtors.

AMENDED MEMORANDUM OPINION AND ORDER CONVERTING CHAPTER 11 CASE TO CHAPTER 7 CASE

STANLEY B. BERNSTEIN, Bankruptcy Judge.

*Introduction:*

Atlantic Richfield Oil Co. (Arco) filed a motion to convert this Chapter 11 case to Chapter 7 under 11 U.S.C. § 1112(b)(2) because of the Debtors' inability to effectuate a plan. The Debtors have, in fact, filed a Second Amended Plan (plan), which the Debtors have conceded is their best and final effort. Arco has argued that the Debtors' plan cannot be confirmed because it does not satisfy 11 U.S.C. § 1129(a)(3) that the plan be proposed in good faith. Assuming that the plan is the Debtors' best and final effort and that the plan cannot be confirmed, then it would follow that the Debtors cannot effectuate a plan and that the case should be converted. In further support of its contention, Arco points to the very marginal economic performance of the Debtors during the full year of operations as Chapter 11 Debtors in Possession. This Court is satisfied that the Debtors' plan is not proposed in good faith, that the Debtors cannot effectuate a plan, and that the case should be immediately converted to Chapter 7.

Arco obtained a judgment against the Debtors in the amount of $924,518.01 on October 12, 1982. Arco claims to be a secured creditor based upon liens and security interests granted to it by the Debtors in February of 1982. The Debtors assert that such liens are avoidable as fraudulent conveyances under Michigan state law, M.C.L.A. § 566.14. For purposes solely of this motion, the Court is prepared to treat Arco's claim as unsecured.

On March 7, 1983, the Debtors filed their joint Chapter 11 petition to stay collection of Arco's judgment. This case has been pending for a full year. The Debtors' plan proposes a sale of all of the assets of the Debtors to a corporation to be formed by E. Barr, the father and father-in-law of the Debtors. The Debtors have estimated that little more than a one percent dividend

upon confirmation will be paid to holders of allowed unsecured claims. The liquidation analysis in the Debtors' Third Amended Disclosure Statement shows that there will be insufficient proceeds to pay more than the secured claims and administrative expenses. The acquiring corporation would continue to operate the present business of the Debtors. That business includes the wholesaling of gas and other petroleum products from a bulk oil plant and the retailing of gas and other products at three combination gas stations and convenience stores. The acquiring corporation intends to rehire at least five members of the extended family of the Debtors: father, mother, two married daughters and their spouses, who are presently employed by the Debtors in Possession.

*Analysis:*

At bottom Arco characterizes the Debtors' plan as a "scam." The Debtors initially proposed to cram-down the unsecured debtors and retain all their assets: the initial plan contemplated the Debtors' borrowing $100,000 on a secured basis from E. Barr.

Arco's earlier motion to convert was premised on the ground that the cram-down power under 11 U.S.C. § 1129(b)(2)(B)(ii) was not available to sole (or joint) proprietors. That motion was denied after the matter was submitted on briefs. The legislative history supported the Debtors' contention that as sole (or joint) proprietors, they held a cognizable "interest" in the assets of the business to which § 1129(b)(2)(B)(ii) could, in principle, apply. This Court held, however, that the same section required the cancellation of that interest by means of a bulk sale to a good faith purchaser. This is analogous to the cancellation of an outstanding issue of common stock held by the equity security holders or insiders of the debtor corporation, and the sale of a new issue of common stock by the reorganized debtor to a good faith purchaser. Both sales have to be noticed to creditors and are subject to competitive bidding. The revised plan of the debtors purports to comply with the Court's construction of § 1129(b)(2)(B)(ii).

Arco's contention is that a new corporation formed by an "insider" of the Debtors effects no practical change in their circumstances. The Debtors, their daughters, and sons-in-law will continue to operate the very same business with one significant change—the Debtors will be discharged of over a million dollars of unsecured debts. For all practical purposes the Debtors will be retaining their interest in all their property. To confirm a plan of that character is to promote form over substance, claims Arco. No plan with that practical consequence can be considered as proposed in good faith.

The Debtors' reply is that they will not be retaining any interest in their business or personal assets. Their personal household goods and residences will be leased back by the corporation, but the business assets will be owned by the corporation and not leased back to the Debtors. The Debtors will be employed by the new corporation, but neither they, their daughters, nor their sons-in-law will hold stock in the new corporation. Yes, with some reallocation of responsibilities, the Debtors, their daughters, and sons-in-law will continue to manage the same business, but the key to a cram-down is a loss of an ownership interest, not a loss of re-employment.

§ 1129(b)(2)(B)(ii) could be narrowly construed to mean that the only effective safeguard is for an objecting creditor to bid more for the assets than does the proponent of the plan. In principle, that would present abuse in the form of "low-ball bidding." Arco apparently does not want to add to its loss by funding the amounts necessary to cure the defaults in the secured loans and the amounts to satisfy priority creditors. It would be especially galling for Arco to pay the allowed fees of the Debtors' counsel.

The economic performance of the Debtors has been so marginal during the Chapter 11 that Arco cannot be blamed for its reluctance to advance any funds to purchase an unprofitable business. During

the last reported six month period of operations from August 1, 1983 through January 31, 1984, the aggregate net profits from the Debtors proprietorship were $2,600.00. The Third Amended Disclosure Statement admits that the profit and loss statements failed to account for professional fees; the Debtors' counsel was previously allowed interim fees of $20,844.59 which remain unpaid, and counsel has accrued at least an additional $15,000.00. If the statement were adjusted for allowed and accrued fees, the aggregate losses from the date of filing of the Chapter 11 petition would exceed $20,000.00. Substantial additional fees would have to be projected for anticipated litigation on issues of nondischargeability of the Debtors' indebtedness to Arco and on the invalidity or avoidability of Arco's liens. Apart from any considerations of good faith, this Court has very substantial reservations about any acquiring corporation's ability to operate this business on a profitable basis. Mr. E. Barr's motive in advancing $100,000 to secured and priority creditors is to keep his son, daughter-in-law, granddaughters and their husbands in business; the acquisition expense is better viewed as an intra-familial gift. Acquisition of the ownership of the Debtors' fully encumbered assets would appear to be decidedly secondary to that gift.

At this stage the maxim "be just before being generous" is called to mind. Mr. E. Barr's generosity to his family members would, if approved by this Court, result in a discharge of close to one million dollars of unsecured debts. That is simply unacceptable when for all practical purposes the Debtors continue to manage their same business.

No amount of refined (or strained) analysis can still the moral outrage that the Debtors' plan triggers. At some point, a court of equity has to say, no, this cannot be. Congress cannot have intended to permit individual debtors to discharge a million dollars of unsecured indebtedness by having a wealthy relative fund the costs of curing defaults in secured loans and of administration by making a gift of one hundred thousand dollars to keep members of his family employed in their old business. If "good faith" is to have any moral significance, the Debtors' plan cannot be found to be deserving of that appellation. Arco has no duty to outbid charitable contributions by an insider at the cost of increasing its losses. 11 U.S.C. § 1129(b)(2)(B)(ii) presupposes a rational economic calculus as a premise to competitive bidding. That premise is clearly not satisfied under the Debtors' plan.

In further support of this conclusion, the Court draws strength from the Chapter 13 case of *Memphis Bank & Trust Co. v. Whitman,* · 692 F.2d 427 (6th Cir.1982). Good faith as a condition to confirmation of a plan cannot be satisfied when the Debtors seek to carry out "a basically dishonest scheme."

It really does not matter in the last analysis that liquidation will result in greater losses to the creditors of this estate—that is not the dispositive consideration. An abuse of Chapter 11 is not founded on "worse case" analyses. The most extensive collection and restatement of authorities on "good faith" is written by former Bankruptcy Judge Robert Ordin, *"The Good Faith Principle in the Bankruptcy Code: A Case Study,"* 38 Bus.Lawyer (Aug.1983).

The Motion of Arco is GRANTED; this Chapter 11 case is converted to Chapter 7.

IT IS SO ORDERED.